UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BRIAN W. SEXTON,                                Hon. Thomas L. Ludington

    Plaintiff,

vs.                                             File No. 12-10946 BC

PANEL PROCESSING, INC.,
A Michigan Corporation, and
PANEL PROCESSING OF COLDWATER,
INC., A Michigan Corporation

    Defendants.

| WILLIAM A. PFEIFER  (P45263) | BODMAN PLC |
|---|---|
| Attorney for Plaintiff | Steven J. Fishman (P13478) |
| ISACKSON, WALLACE & PFEIFER P.C. | Donald H. Scharg (P29225) |
| 114 South Second Avenue | David A. Malinowski (P72076) |
| Alpena, MI 49707 | Attorneys for Defendant |
| (989) 354-8242 | 201 W. Big Beaver Road, Suite 500 |
| | Troy, MI 48084 |
| | (248) 743-6000 |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Brian W. Sexton, by his attorney, William A. Pfeifer of the law firm of Isackson, Wallace & Pfeifer, P.C. respectfully responds to Defendants' Motion For Summary Judgment under Fed.R.Civ.P.56 and for the reasons stated in the accompanying brief, asks that the Court deny Defendants' request for summary judgment.

Dated: July 24, 2012

                                        /s/ William A. Pfeifer
                                        William A. Pfeifer
                                        ISACKSON, WALLACE & PFEIFER, P.C.
                                        Attorney for Plaintiff
                                        114 S. Second Avenue
                                        Alpena, MI 49707
                                        bill@alpenalegal.com
                                        (P45263)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BRIAN W. SEXTON,                                    Hon. Thomas L. Ludington

    Plaintiff,

vs.                                                 File No. 12-10946 BC

PANEL PROCESSING, INC.,
A Michigan Corporation, and
PANEL PROCESSING OF COLDWATER,
INC., A Michigan Corporation

    Defendants.

| WILLIAM A. PFEIFER  (P45263) | BODMAN PLC |
|---|---|
| Attorney for Plaintiff | Steven J. Fishman (P13478) |
| ISACKSON, WALLACE & PFEIFER P.C. | Donald H. Scharg (P29225) |
| 114 South Second Avenue | David A. Malinowski (P72076) |
| Alpena, MI  49707 | Attorneys for Defendant |
| (989) 354-8242 | 201 W. Big Beaver Road, Suite 500 |
| | Troy, MI  48084 |
| | (248) 743-6000 |

**PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

STATEMENT OF ISSUES PRESENTED ......................................................... iii

I. INTRODUCTION ................................................................................. 1

II. STATEMENT OF MATERIAL FACTS ..................................................... 2

III. ARGUMENT ........................................................................................ 7

    1. Whether the Employee Retirement Income Security Act ("ERISA") preempts all of Plaintiff's state-law claims under Michigan's Whistleblower Protection Act (Count I) and his claim for breach of an implied contract (Count II) where Plaintiff's Complaint sets out not only an alleged violation of ERISA, but also violations of the Michigan Business Corporation's Act and potential violations of other state and federal law? ......................................................... 7

    2. Even if Defendant is correct that ERISA preempts Plaintiff's State law claim as it applies to ERISA, does it prevent him from maintaining his claim for violation of the Michigan Business Corporations Act and other potential violations of state and federal law regardless of whether he engaged in what is considered protected activity under ERISA? ......................................... 9

    3. Whether Plaintiff's State law breach of implied contract claim (Count II) fails because he was an at-will employee. ............................................... 12

IV. RELIEF REQUESTED ................................................................................ 14

i

# TABLE OF AUTHORITIES

**Cases:**

*Anderson v. Elec. Data Sys. Corp.*, 11 F.3d 1311 (5th Cir.1994) ............................ 10, 11

*Authier v Ginsberg*, 757 F.2d 796, 800 (6th Cir. 1985) ............................................... 7

*Dickson v Oakland University*, 171 Mich App 68, 429 NW2d 640 (1988) ........................ 8

*Edwards v A.H. Cornell & Sons, Inc.*, 610 F.3d 217 (3rd Cir 2010) .......................... 9, 12

*Hashimoto v. Bank of Hawaii*, 999 F.2d 408 (9th Cir.1993) ...................................... 10, 11

*King v. Marriott Intl Inc.*, 337 F.3d 421 (4th Cir. 2003) ............................................ 10, 11

*Nicolaou v Horizon Media, Inc.*, 402 F.3d 325 (2d Cir. 2005) ......................................... 10

*Roberson v Occupational Health Centers of America*, 220 Mich App 322,
   559 NW2d 86 (1996) ............................................................................................. 8

*Rood v General Dynamics Corp.*, 444 Mich 107, 507 NW2d 591 (1993 ...................... 13, 14

*Rowe v Montgomery Ward & Co.*, 437 Mich 627, 473 NW2d 268 (1991) ........................ 13

*Shallal v Catholic Social Services*, 455 Mich 604, 566 NW2d 571 (1977) ............................ 8

**Federal Court Rules:**

Fed.R.Civ.P. 56(c)(1)(A) ................................................................................................ 1

**Statutes:**

29 U.S.C. § 1140 ................................................................................................... 9, 10

29 U.S.C. § 1144(a) ...................................................................................................... 7

MCLA 15.361 et.seq .................................................................................................... 1

# STATEMENT OF ISSUES PRESENTED

1. Whether the Employee Retirement Income Security Act ("ERISA") preempts all of Plaintiff's state-law claims under Michigan's Whistleblower Protection Act (Count I) and his claim for breach of an implied contract (Count II) where Plaintiff's Complaint sets out not only an alleged violation of ERISA, but also violations of the Michigan Business Corporation's Act and potential violations of other state and federal law?

    Plaintiff states: No

    Defendant states:   Yes

2. Even if Defendant is correct that ERISA preempts Plaintiff's State law claim as it applies to ERISA, does it prevent him from maintaining his claim for violation of the Michigan Business Corporations Act and other potential violations of state and federal law regardless of whether he engaged in what is considered protected activity under ERISA?

    Plaintiff states: No

    Defendant states:   Yes

3. Whether Plaintiff's State law breach of implied contract claim (Count II) fails because he was an at-will employee.

    Plaintiff states: No

    Defendant states:   Yes

I.  INTRODUCTION

Brian Sexton ("Plaintiff") is a former employee of Panel Processing Inc. and Panel Processing of Coldwater, Inc. (collectively "Panel Processing" or "Defendants"). He is suing Panel Processing alleging that he was discharged in violation of Michigan's Whistleblower Protection Act, MCLA 15.361 et.seq. ("MWPA"), for violations of ERISA and the Michigan Business Corporations Act and potential violations of other state and federal law. His claim is not limited in Count I to a violation of ERISA law as set forth in Defendants' Motion for Summary Judgment. Plaintiff complains as part of his Count I that there was a violation of the Employee Retirement Income Security Act ("ERISA") pertaining to an Employee Stock Ownership Plan ("ESOP") and violations of the Michigan Business Corporations Act.

Plaintiff's lawsuit should not be dismissed simply because of the premption doctrine as it relates to ERISA. Furthermore, Plaintiff's Claim under the MWPA only requires a good faith belief that a violation of federal or state law occurred and that Plaintiff took action toward reporting such violation.

Plaintiff's claims for breach of implied contract and MWPA should not be dismissed at this point until he is allowed further discovery on the issue to attempt to establish his claim for breach of an implied employment contract and MWPA violations and attached hereto is an affidavit pursuant to Fed.R.Civ.P. 56(c)(1)(A) (Plaintiff's Exhibit 1[1]).

---

[1] Plaintiff's Exhibit 1 is the Affidavit of Brian Sexton.

1

## II. STATEMENT OF MATERIAL FACTS

It is true that before his discharge, Plaintiff Brian Sexton held the position of General Manager of the Panel Processing plant in Coldwater, Michigan. It is further true that as the Coldwater General Manager, he held the top management position and was in charge of effectively managing Coldwater's three plants as set forth in Defendants' Motion for Summary Judgment. Plaintiff reported to Alan Kelsey ("Kelsey") who was Panel Processing's Chief Operating Officer ("COO") based in Alpena, Michigan.

Although Plaintiff testified as contained in Page 2 of Defendants' brief, Plaintiff was also asked whether he believed his at will employment was modified in any way. Plaintiff testified that when he took a seat on the Panel Processing Board of Directors, that Chairman Eric Smith, Panel Processing's Chief Executive Officer ("CEO") advised him to not worry about his employment as it related to being a Director who would have direct power over Alan Kelsey, Panel Processing's COO. Alan Kelsey was the individual that Plaintiff Brian Sexton directly reported to.

Plaintiff's signing in 2004 of a written at-will disclaimer confirming that he was an at-will employee did not change his belief based on conversations with Panel Processing's CEO Eric Smith, and the verbal assurances that his actions as Director would not affect his position in the company.

Plaintiff further admits that he did sign what is attached to Defendant's brief as Exhibit 5, which was the Panel Processing, Inc. Employee Technology, Confidentiality, and Non-Competition Agreement. The non-compete clause does contain the provision that "This agreement does not change the at-will nature of my employment with Panel Processing." However, Plaintiff Brian Sexton and other employees were essentially forced to sign those agreements and were also led to believe that if they signed them, their employment with Panel Processing would be assured and that

the only restrictions they would have was that if they voluntarily left Panel Processing that they would not, for a period of 12 months following termination of their employment, work for, contract with, consult with, own an interest in or manage, operate, control or be involved in any capacity with a business that is competitive with Panel Processing without the express written authorization of the President of Panel Processing. The President of Panel Processing was Eric Smith, CEO, the same individual who indicated to Mr. Sexton that his employment was assured by placement of Plaintiff on the Board of Directors.

Panel Processing employees do participate in an Employee Stock Ownership Plan ("ESOP") **(Defendants Exhibit 6)**. The ESOP is governed by the Employee Stock Ownership and Money Purchase Pension Trust Agreements ("ESOP Agreement") which do provide for a committee of Trustees to manage the ESOP. Under the ESOP agreement, employee participant's have the right to vote company stock for the reasons set forth in the document. In April of 2011, the Trustee committee did consist of Plaintiff Brian Sexton, Robert Karsten and Panel Processing President, Eric Smith. Panel Processing's Board of Directors at that time consisted of Eric Smith, Brian Sexton, Tom Karsten, Al Kelsey, George LaFleche, Mike Kelly and Robert Karsten.

In April of 2011, there was an election for two Board of Director positions pursuant to the ESOP Plan and the bylaws of Panel Processing **(See Defendant's Exhibit 7 and Plaintiff's Exhibit 2)**. A write-in campaign had begun for the purpose of electing Panel Processing employees James Skiba and Robert Fitch to the Board of Directors. Although Panel Processing now alleges that the ESOP Agreement did not provide for employee voting of Directors, the Trustee Committee sent ballots to employees to allow them to vote for the election of the two Directors. None of the employees of Panel Processing were <u>ever</u> advised that their vote was of an advisory nature and for

3

many years, Panel Processing honored the votes of its employee-owners. Further, the bylaws of Panel Processing (Plaintiff's Exhibit 2) do not provide that a Director position is limited by some nomination of the existing Board of Directors and further provides under Article I, Section 2:

> "The annual meeting of shareholders shall be held of the Registered Office of this Corporation or such place as shall be designated by the Board on the second Saturday of March or such other date as may be set by the Board of Directors. **One of the purposes of such meeting shall be the election of Directors.**" (emphasis added).

Clearly, the election of Directors relates to the annual meeting of the shareholders and any there is no other practical reading of the bylaws other than they provide that the shareholders of Panel Processing shall elect the Directors. No where does it provide for any "advisory vote" pursuant to the ESOP and further, Article IV, Board of Directors, does not provide that members of the Board of Directors can only be nominated by the existing Board of Directors. In fact, Section 2 of Article IV provides regarding "vacancies" that

> "all vacancies in the membership of the Board may be filled by appointment made by the remaining Directors. Each person so appointed to fill a vacancy shall remain a Director until his successor has been elected by the **shareholders**, who may make such election at their next annual meeting for that purpose." (Emphasis added).

If a vacancy is filled temporarily by appointment of the remaining Directors subject to a vote of the **shareholders** at the next meeting or any special meeting for that purpose, it cannot be said with a straight face that the Directors initially are elected by anything other than a vote of the shareholders.

Following the return of the employee ballots, it was determined that Mr. Fitch and Mr. Skiba had the most employee votes. The Board of Directors and Trustee meetings originally scheduled for April 15, 2011 were adjourned by CEO Eric Smith to April 29, 2011 for no apparent reason. As Plaintiff has not had an opportunity to take the deposition of CEO Smith, Plaintiff is still

4

unaware of why the adjournment of those meetings took place but the meetings were called and the Board of Directors were available. In fact, Plaintiff Sexton drove from Coldwater, Michigan to Alpena, Michigan to attend the meeting and was told a few minutes before the meeting was to begin that it had been adjourned but was not given any reason for said adjournment.

It is true that at the April 29, 2011 Board meeting that the existing Panel Processing Board of Directors voted to remove Plaintiff Brian Sexton and Robert Karsten as Trustees. However, it does not appear from the ESOP document that there was any authority for the Board of Directors to do so. In fact, the ESOP does not clearly lay out how the Trustee/Plan Committee of the ESOP are appointed or voted in. In any event, even if Defendants believed they had the right to remove Plaintiff Sexton and Robert Karsten as Trustees, either Panel Processing employee James Skiba or Robert Fitch should have been seated on the Board as an inside Director.

Following the April 29, 2011 Board meeting wherein Mike Kelly was voted in as a Trustee, their was also a Trustee's meeting where the Trustee's voted Al Kelsey and George LaFleche to the Board of Directors. Once again, nowhere in the ESOP plan does it provide for the Trustees to elect members of the Board of Directors. Further, the bylaws do not provide that members of the Board of Directors are elected by the Trustees of the ESOP.

On May 2, 2011, Plaintiff Brian Sexton sent CEO Smith an e-mail complaining of alleged violations of ERISA, the Michigan Business Corporations Act and other state and federal law concerning not only his removal as Trustee but also the refusal to seat Mr. Skiba and Mr. Fitch as Directors. (See Defendants Exhibit 12) Although Mr. Sexton did not specifically report any suspected violations to the attention to either the US Department of Labor or any other public body, the Michigan Whistleblowers' Protection Act only provides that "he has reported or is about to

report." The actions he took were consulting with an attorney who advised him that there were violations of ERISA law and the Michigan Business Corporations Act and was in the process of filing a lawsuit against Defendant Panel Processing.

Plaintiff Sexton did testify that he requested attorney fee reimbursement pursuant to company policy and that some time around October 17, 2011, he sent Panel Processing a request for the attorney fee reimbursement that he incurred as a Trustee for attempting to seat Mr. Skiba and Mr. Fitch on the Board of Directors. At that point, it is Plaintiff's position that Panel Processing knew, based upon that request, that he was either reporting or about to report a suspected violation of state or federal law and that prompted his termination a mere two weeks later.

A part of Plaintiff's underlying claim for a violation of the Michigan Whistleblowers' Protection Act and violations of other state and federal laws are based upon Plaintiff's discharge and the discharge of other employees similarly situated. In fact, shortly after the election of the Board of Directors complained of here, Paul Karsten, son of Robert Karsten, was discharged from his position at Panel Processing due to alleged economic conditions. Subsequently, James Skiba, the individual who received the most votes in the election was discharged in October of 2011, also due to alleged economic conditions. Plaintiff, Brian Sexton was discharged at the end of October 2011. It was no secret amongst the Board of Directors of Panel Processing or employees of the company that the Board of Directors, and Eric Smith specifically, thought that the write-in campaign was staged and administered by Plaintiff Brian W. Sexton and fellow discharged employees James Skiba - who received the most votes, and Paul Karsten, son of Robert Karsten, who was a Trustee of the ESOP and who was removed as a Trustee of the ESOP along with Plaintiff Brian Sexton on April 29, 2011.

Once again, as Plaintiff has been unable to conduct any meaningful discovery at this point, facts that may be developed to support his claim are not in Plaintiff's possession at this point.

## III. ARGUMENT

    1. Whether the Employee Retirement Income Security Act ("ERISA") preempts all of Plaintiff's state-law claims under Michigan's Whistleblower Protection Act (Count I) and his claim for breach of an implied contract (Count II) where Plaintiff's Complaint sets out not only an alleged violation of ERISA, but also violations of the Michigan Business Corporation's Act and potential violations of other state and federal law?

Plaintiff agrees that Defendants' assertion that the ERISA preemption of state law claims is broad. Further ERISA's own preemption section, 29 U.S.C. § 1144(a), does provide that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." Plaintiff further agrees that ERISA preempts state law and state law claims that 'relate to' any employee benefit plan as that term is defined [in the statute]..." *Authier v Ginsberg*, 757 F.2d 796, 800 (6th Cir. 1985) does indicate, in general, that if the action relates to an ERISA plan, it is preempted. *Authier* was a case where Plaintiff brought a Michgian common-law cause of action for wrongful discharge wherein he alleged that future proposed changes to a profit sharing plan could violate ERISA. In *Authier*, the court did conclude that because plaintiff's claim hinged on obligations under ERISA, his state law claim was preempted by ERISA because "ERISA created a substantive element of the Michigan action."

Plaintiff's claim in Count I of his complaint under the Michigan Whistleblowers' Protection Act includes Plaintiff's assertion that there were violations of the Michigan Business Corporations Act as well. Even if Plaintiff's claim under the Michigan Whistleblowers' Protection Act is preempted by ERISA, it would not preempt Plaintiff's claim that there were also violations of the

7

Michigan Business Corporation Act and therefore summary judgment as to Count I at this time would be in appropriate.

Defendant's Exhibit 12 attached to their brief provides that Brian Sexton notified Eric Smith as follows:

> "I believe that your actions on Friday in refusing to seat Bob Fitch and Jim Skiba as directors of the company and removing Rob Karsten and me as Trustees of the ESOP are violations of ERISA and the Michigan Business Corporations Act and other state and federal laws, I plan to bring these violations to the attention of the U.S. Department of Labor and Michgian Department of Licensing and Regulatory Affairs unless they are immediately remedied."

It's clear that Plaintiff's claim for protection pursuant to the Michigan Whistleblowers' Protection Act is not limited to the claim of a violation of ERISA.

The Michigan Whistleblowers' Protection Act prohibits an employer from discriminating against an employee because the employee has reported or is about to report to a public body a violation or suspected violation of a federal or state statute or regulation. The elements of a Michigan Whistleblowers' Protection Act claim are that:

1. The Plaintiff was engaged in protected activity;

2. The Plaintiff was later discharged or disciplined;

3. There was a causal connection between the protected activity and the discipline or discharge.

*Roberson v Occupational Health Centers of America*, 220 Mich App 322,
559 NW2d 86 (1996)

The Act states that making an internal complaint to the employer does not suffice unless there is sufficient evidence that the employee was about to report to a public body. *Dickson v Oakland University*, 171 Mich App 68, 429 NW2d 640 (1988); *Shallal v Catholic Social Services*, 455 Mich 604, 566 NW2d 571 (1977). It is clear that Plaintiff's Complaint is not limited to simply a violation of ERISA but that a alleged violation of ERISA is a portion of the complaint. Further, Plaintiff

8

should be allowed to maintain a Michigan Whistleblowers' Protection Act case for violation of any federal or state statute or regulation. Therefore, even if the court were to determine that preemption is appropriate regarding ERISA (which it appears that it is), the preemption doctrine regarding ERISA would not preempt Plaintiff from maintaining a Michigan Whistleblowers' Protection Act claim for violation of the Michigan Business Corporations Act or other violations of state or federal laws not related to ERISA.

Therefore, Summary Judgment is not appropriate at this time as to Count I.

2. **Even if Defendant is correct that ERISA preempts Plaintiff's State law claim as it applies to ERISA, does it prevent him from maintaining his claim for violation of the Michigan Business Corporations Act and other potential violations of state and federal law regardless of whether he engaged in what is considered protected activity under ERISA?**

Based upon his response to issue 1, Plaintiff once again affirmatively states that even if Defendant is correct that ERISA preempts Plaintiff's state law claim as it applies to ERISA, it does not prevent him from maintaining his claim for violation of the Michigan Business Corporations Act and other potential violations of state and federal laws regardless of whether he engaged in what is considered "protected activity" under ERISA. 29 U.S.C. § 1140 provides that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding related to this chapter or the Welfare and Pension Plan's disclosure Act.

In their brief, Defendants cite the case of *Edwards v A.H. Cornell & Sons, Inc.*, 610 F.3d 217 (3rd Cir 2010) as being instructive in this matter and Plaintiff agrees. It is important to note in that case that the Secretary of Labor of the United States filed an *amicus curiae* brief in support of Edward's position.

9

The issue on appeal in that case was whether the District Court erred in holding that unsolicited internal complaints are not protected activities under the anti-retaliation provision of the Section 510 of ERISA, 29 U.S.C. § 1140.

As the opinion notes, the Federal Courts of Appeals are split on whether Section 510 encompasses unsolicited internal complaints. The Fifth and Ninth Circuits have held in the affirmative, see *Anderson v. Elec. Data Sys. Corp.*, 11 F.3d 1311 (5th Cir.1994), and *Hashimoto v. Bank of Hawaii*, 999 F.2d 408 (9th Cir.1993), while the Second and Fourth Circuits have held in the negative, see *Nicolaou v Horizon Media, Inc.*, 402 F.3d 325 (2d Cir. 2005), and *King v. Marriott Intl Inc.*, 337 F.3d 421 (4th Cir. 2003).

The Ninth and Fifth Circuits were the first circuits to consider the issue. In each case, the plaintiff employee filed a complaint under state law alleging wrongful discharge for complaining to supervisors about alleged ERISA violations. *Hashimoto*, 999 F.2d at 409-10; *Anderson*, 11 F.3d at 1312-13. Finding that Section 510 of ERISA already provided employees with a remedy, the Ninth Circuit held that the employee's state law claim was completely preempted by ERISA and remanded the case to allow the state claim to be re-characterized as a federal cause of action. *Hashimoto*, 999 F.2d at 411-12. The court explained that the failure of Section 510 to protect internal complaints would, in practice, inhibit the effectiveness of the anti-retaliation provision:

> "The normal first step in giving information or testifying in any way that might tempt an employer to discharge one would be to present the problem first to the responsible managers of the ERISA plan. If one is then discharged for raising the problem, the process of giving information or testifying is interrupted at its start: the anticipatory discharge discourages the whistle blower before the whistle is blown."
> *Id* at 411

10

Shortly thereafter, the Fifth Circuit arrived at the same conclusion in *Anderson*, holding that a state law claim for wrongful discharge was preempted by ERISA in part "because the cause of action would conflict with the enforcement provisions of §§ 502(a) and 510 of ERISA." 11 F.3d at 1314. The court further explained, in broad terms, "[the employee's] claim falls squarely within the ambit of ERISA § 510[,]" which "addresses discharges for exercising ERISA rights or for the purpose of interfering with the attainment of ERISA rights, as well as discharges for providing information or testimony relating to ERISA." Id. (quotations and citations omitted).

Faced with the same issue, the Fourth Circuit has since drawn the opposite conclusion, holding that an employee's state law wrongful discharge claim is not preempted by ERISA because Section 510 does not protect unsolicited internal complaints. *King*, 337 F.3d at 427-28. Focusing on "the proper scope of the phrase 'inquiry or proceeding,' "the court analogized Section 510 to the anti-retaliation provision in the Fair Labor Standards Act (FLSA) :

> "In the instant case, as well, the use of the phrase 'testified or is about to testify' does suggest that the phrase Inquir[ies] or proceeding[s]' referenced in section 510 is limited to the legal or administrative, or at least to something more formal than written or oral complaints made to a supervisor. The phrase 'given information' does no more than insure that even the provision of non-testimonial information (such as incriminating documents) in an inquiry or proceeding would be covered. And, here as well [ ], the anti-retaliation provision in section 510 is much narrower than the equivalent [in Title VII.]" *Id* at 427

The Fourth Circuit found that the Ninth and Fifth Circuit decisions in *Hashimoto* and *Anderson*, respectively, were not persuasive. According to the court, the Ninth Circuit in *Hashimoto* improperly "reject[ed] the most compelling interpretation of the statutory language for a 'fair' interpretation," and the Fifth Circuit in Anderson "merely recited section 510 without even addressing the facial inapplicability of section 510 to intra-office complaints." *Id.* at 428.

11

There having been no ruling in this District Court, or the 6th Circuit Court of Appeals regarding this specific issue, to the best of Plaintiff's information, knowledge and belief, requires this court to address it as a matter of first impression. Because of the spilt amongst the Federal Circuit Courts, Plaintiff asks that this Court adopt the rulings in the Ninth and Fifth Circuits.

The dissent in *Edwards* makes a persuasive argument when it states:

> "The normal first step in giving information or testifying in any way that might tempt an employer to discharge one would be to present the problem first to the responsible managers of the ERISA plan. If one is then discharged for raising the problem, the process of giving information or testifying is interrupted at its start: the anticipatory discharge discourages the whistle blower before the whistle is blown."
> *Id* at 411.

Plaintiff requests that this Court adopt such rationale in this case.

The case of *Edwards v A.H. Cornell & Sons, Inc.*, did find that the Plaintiff did not engage in an inquiry or investigation under §1140 because the information that plaintiff relayed to management was unsolicited, not part of an inquiry of the employer, and was not a complaint that sought information. In this case, Plaintiff testified that he sent an e-mail to the Defendant. Further he did have conversations with the employee director and conversations with attorneys. He also made a request for reimbursement of Trustee attorney fee expenses regarding his removal as Trustee.

Plaintiff's case should not be dismissed on Summary Judgment grounds.

3. **Whether Plaintiff's State law breach of implied contract claim (Count II) fails because he was an at-will employee.**

Plaintiff has alleged in his Count II that management of Defendants' Company made statements to Plaintiff and to other employees of Defendant that it was Defendants' policy not to discharge Plaintiff or others similarly situated from Defendants' employment as long as he

12

performed his job. Further, Plaintiff alleges that while employed by Defendants, he was led to believe that he would not be terminated except for good cause. Plaintiff also alleged that the policies, statements and representations of Defendant, through its agents, servants, or employees were relied upon by him and as a result, there was by express words, implications, or operation of law, a contractual agreement between Plaintiff and Defendant by which Defendant was obligated to terminate Plaintiff's employment only for good cause.

It is true as alleged in Defendants' motion that Plaintiff did sign two at-will disclaimers. Further, he also signed the document attached to Defendants' motion as Exhibit 5. Employer's policies, words or actions can instill a legitimate expectation of just cause employment. *Rood v General Dynamics Corp.*, 444 Mich 107, 507 NW2d 591 (1993). All relevant circumstances, including all writings, oral statements and other conduct manifesting assent are considered *Rowe v Montgomery Ward & Co.*, 437 Mich 627, 473 NW2d 268 (1991). *Rowe* provided that assurances must be clear and unequivocal to overcome the presumption of at-will employment. To determine whether there was mutual assent to a contract, the court focuses on how a reasonable person in the promisee's position would have interpreted the promisor's statements or conduct. In this case, Plaintiff alleges that the Chairman of the Board and Chief Executive Officer of the company, when he placed Plaintiff on the Board of Directors (exercising power that coincidently he may not have had), assured him that his activities as a Director would in no way affect or be used against him regarding his employment with the company. Such oral assurances created just cause employment.

Clearly, in Michigan an employer's policies, words or actions can instill a legitimate expectation of just-cause employment. If the employer's conduct could be interpreted differently by reasonable people, the question must go to a jury. The inquiry is whether the employer's policies

13

are reasonably capable of being interpreted as promises of just-cause employment. *Rood* 444 Mich at 140. If the policies are capable of two reasonable interpretations, the issue is for the Jury. *Id.* at 140-141. Therefore, Defendants' Motion for Summary Judgment should be denied.

## IV. RELIEF REQUESTED

WHEREFORE Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgment.

Dated: July 24, 2012

/s/ William A. Pfeifer
William A. Pfeifer    (P45263)
ISACKSON, WALLACE & PFEIFER, P.C.
Attorney for Plaintiff
114 S. Second Avenue
Alpena, MI  49707
bill@alpenalegal.com

### Certificate of Service

I hereby certify that on July 24, 2012, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will sent notification of such filing to:

dmalinowski@bodmanlaw.com, dscharg@bodmanlaw.com, and sfishman@bodmanlaw.com. I also certify that on July 24, 2012 I have mailed by United States Postal Service a "CHAMBERS COPY" to the Hon. Thomas L Ludington, P.O. Box 913. Bay City, MI 48707.

Dated: July 24, 2012

/s/ William A. Pfeifer
William A. Pfeifer    (P45263)
ISACKSON, WALLACE & PFEIFER, P.C.
Attorney for Plaintiff
114 S. Second Avenue
Alpena, MI  49707
bill@alpenalegal.com