UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BRIAN SEXTON,

             Plaintiff,

                                        Case No. 12-10946

v.                                   Honorable Thomas L. Ludington

PANEL PROCESSING, INC., et al.,

             Defendants.

_____ /

**OPINION AND ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DECLINING
JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIM**

Section § 510 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1140, protects an employee who "has given information . . . in any inquiry or proceeding relating to [ERISA]." The question in this case is whether § 510 extends its protections to an employee's unsolicited, internal complaint to his employer that it has violated ERISA.

The issue has split the circuits. The Second, Third, and Fourth Circuits hold that § 510 does not protect such complaints; the Fifth, Seventh, and Ninth Circuits hold that it does.[1] The Sixth Circuit has not yet had occasion to address the issue. For the reasons detailed below, the Court concludes that in this case § 510 does not protect the plaintiff's unsolicited, internal complaint — an email to his employer threatening to report its ERISA violations to state and federal authorities — because it was unconnected to any "inquiry or proceeding."

---

[1] *Compare Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 222–24 (3d Cir. 2010); *Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 330 (2d Cir. 2005) (per curiam); *King v. Marriott Int'l, Inc.*, 337 F.3d 421, 427–28 (4th Cir. 2003) (Luttig, J.); *with George v. Junior Achievement of Cent. Ind., Inc* 694 F.3d 812, 815 (7th Cir. 2012) (Easterbrook, J.); *Anderson v. Electronic Data Systems Corp.*, 11 F.3d 1311, 1313, 1315 (5th Cir. 1994) (same); *Hashimoto v. Bank of Hawaii,* 999 F.2d 408, 411 (9th Cir. 1993).

Briefly, "inquiry" means "the act or an instance of asking for information."[2]   When information has not been asked for by either the employee, employer, or anyone else, as in this case, there has not been an "inquiry."  Similarly, "proceeding" means "the course of procedure in a judicial action or in a suit in litigation."[3]  Although something of a tautology, it is nevertheless true that if there was not a pending "proceeding," as in this case, an employee cannot reasonably be said to have "given information . . . [in a] proceeding."  29 U.S.C. § 1140.

In sum, the plain language of § 510 does not protect unsolicited internal complaints by an employee that are unconnected to an inquiry or proceeding.  To reach a contrary interpretation is to either disregard the language that Congress chose or to subordinate what Congress said for what the Court thinks that Congress may have meant to say.

# I

## A

For 27 years Plaintiff Brian Sexton was employed by Defendants Panel Processing, Inc., and Panel Processing of Coldwater, Inc..  Pl. Dep. 15, May 30, 2012, *attached as* Defs.' Mot. Ex. 1.  At first he worked as a "fabricator, which was basically the entry level position in the shop."  *Id*.  Promoted several times over the years, Plaintiff eventually became the general manager of Defendants' Coldwater, Michigan facility.  *Id*.

---

[2] *Webster's Third New International Dictionary* 1167 (unabridged ed. 2002).  *Black's* likewise defines "inquiry" as "[a] request for information."  *Black's Law Dictionary* 808 (8th ed. 2004).

[3] *Webster's Third New International Dictionary* 1807 (unabridged ed. 2002).  Similarly, *Black's* defines "proceeding" as "[t]he regular and orderly progression of a lawsuit," "[a]ny procedural means for seeking redress from a tribunal or agency," or "[t]he business conducted by a court or other official body."  *Black's Law Dictionary* 1241 (8th ed. 2004).

In 2003, Plaintiff was appointed to Defendants' board of directors. *Id.* Four or five years later (Plaintiff does not recall precisely when), he was appointed as a trustee of Defendants' employee stock ownership plan (ESOP[4]). *Id.* at 15–16.

**B**

Plaintiff began working for Defendant as an "at-will" employee. Over the years, Plaintiff signed several written acknowledgments that his employment was at-will. *See* Defs.' Mot. Exs. 3–5. In 1999, for example, Plaintiff signed a receipt of employee handbook acknowledgement that provided:

> I understand that neither this manual nor any other written or verbal communication by a management representative is intended to, in any way, create a contract of employment for any specified period of time, and that this handbook is for informational purposes only. I also understand that the company abides by employment-at-will, which permits the company or the employee to terminate the employment  relationship at any time, for any reason, with or without notice. The company will not modify their policy of employment-at-will in any case.

*Id.* Ex. 4. Plaintiff signed the same acknowledgement in 2004. *Id.* Ex. 3. In 2007, he signed yet another acknowledgement of his at-will employment as part of a covenant not to compete. *Id.* Ex. 5, at 2. And finally, in Plaintiff's deposition he expressly acknowledged that he was an at-will employee at the time his employment was terminated. He was asked:

> Q: At the time of your termination, is there anything that led you to believe that you were not an at-will employee?
> A: No.
> Q: So stated another way, at the time of your termination, you understood that you were an at-will employee?
> A: Correct.

---

[4] *See Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995) ("An ESOP is an ERISA plan that invests primarily in 'qualifying employer securities,' which typically are shares of stock in the employer creating the plan. (quoting 29 U.S.C. § 1107(d)(6)(A)).

Pl. Dep. 38; *see also* Pl. Dep. 36–37 (acknowledging covenant not to compete did not change at-will status of Plaintiff's employment); *but see* Pl. Dep. 231–33 (asserting that covenant not to compete created "just cause" employment relationship).

### C

Defendants' bylaws provide that the board of directors will have seven members. *See* Defs.' Bylaws art. IV, § 1, *attached as* Pl.'s Resp. Ex. 2. The copy of the bylaws furnished to the Court specifies that the board members "need not be Shareholders of the corporation," but goes on to specify that several members of the board must be insiders. Defs.' Bylaws art. V, §§ 1–4. The chairman of the board, for example, "shall be the chief executive officer of the corporation." *Id*. § 1. The president "shall be the chief operating officer." *Id*. § 2. And the treasurer "shall have custody of all corporate funds and securities." *Id*. § 4.

A shareholders meeting must be held each year, the bylaws further provide, specifying that "[o]ne of the purposes of such meeting shall be the election of directors." Defs.' Bylaws art. I, § 2. Each share of capital voting stock entitles the record holder or proxy to one vote in the election of directors, with the bylaws elaborating:

> A majority of the outstanding shares of this corporation entitled to vote, present by their record holders in person or proxy, shall constitute a quorum at any meeting of Shareholders . . . .
>
> Each Shareholder shall, at every meeting of Shareholders, be entitled to one vote in person or by proxy for each share of capital voting stock of this corporation held by such Shareholder . . . . Directors shall be elected by a plurality of the votes of Shareholders entitled to vote at each meeting of Shareholders for the election of a Director or Directors.

Defs.' Bylaws art. II, § 1, art. III, § 1.

**D**

In 1982, Defendants created their ESOP and an "employee stock ownership and money purchase pension trust."  *See* Defs.' Mot. Ex. 6 (attaching trust agreement).  The trust agreement provides that the ESOP's assets are controlled by a committee, specifying: "The Plan assets shall be invested and controlled by the Committee; provided, however, that the actual management of Trust investments, other than Company Stock, may be delegated to the Trustee."  *Id*. at 2–3.  The trust agreement further provides that the committee also controls how company stock held by the trust is voted, providing:

> All Company Stock held by the Trust shall be voted by the Trustee in accordance with instructions from the Committee.  Notwithstanding the foregoing, each Participant and/or Beneficiary shall be entitled to direct the voting of any voting shares of Company Stock allocated to his Company Stock Account with respect to any vote required for the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all the assets of a trade or business, or other similar transactions prescribed by regulation.

*Id*. at 4.  While the trust agreement has been furnished to the Court, the ESOP has not.  How committee members were selected under the ESOP has not been made part of the record.

**E**

In the spring of 2011, there were three committee members (who also were trustees): Plaintiff Brian Sexton, Robert Karsten, and Eric Smith (Defendants' chief executive officer).  *Id*. at 1.   Defendants' board of directors was made up of four inside directors and three outside directors.  *See* Pl. Dep. 53–54.  The insiders were Plaintiff, Eric Smith, Tom Karsten, and Alan Kelsey (Defendants' chief operating officer).  *Id*.  The outsiders were George LaFleche, Mike Kelly, and Robert Karsten.  *Id*.

Two director seats were up for election at the 2011 shareholders meeting — the seats

held by Messrs. LaFleche and Kelsey.  *See* Defs.' Mot. Ex. 7.  In March 2011, Plaintiff received

a letter explaining:

> At [the annual shareholders meeting], your vote as an ESOP Participant will help
> elect the Panel Processing, Inc. Board of Directors.
>
> The current Board will be nominating the following individuals for re-election to
> a three (3) year term ending in 2014:  George Lafleche and Alan Kelsey.  In
> addition to these nominees, the voting ballots that you will fill out also include
> three nominees for Employee Director.
>
> The procedure for voting is as follows: Attached to this memo are two Trustee
> Direction Forms.  These forms are your voting "ballots."   The first form lists the
> above individuals for re-election and the second lists the Employee Director
> nominees.  You should vote for a total of two (2) for re-election and one (1)
> employee nominee.  The reason that you are directing the Trustees to vote your
> shares is because ESOP shares are recorded in the name of the Trust.  Therefore,
> you do not vote in person at the meeting.  Instead, you use [these] Trustee
> Direction Forms to require the Trustee to vote for you.
>
> By placing an (X) next to the name of a nominee, you will be voting the full
> number of shares allocated to your ESOP account for the person that you have
> selected.  For example, suppose that you have 100 shares of Panel Processing,
> Inc. stock allocated to your ESOP account.  When you place an (X) next to the
> name of two different nominees, you are voting all of your 100 shares in favor of
> each of these nominees.

*Id*. at 1 (emphasis omitted).  Attached was a "trustee direction form" that again explained: "Each

ESOP Participant is entitled to one vote for each share of capital voting stock of this corporation

held by such participant in accordance with Section 9 of the Panel Processing, Inc. Employee

Stock Ownership Plan."  *Id*. at 3.  "Place your vote for Directors by inserting an (X) in the block

next to each nominee of your choice," the form continued, listing the names of two gentlemen:

Alan Kelsey and George Lafleche.  *Id*.

**F**

About this time,  Plaintiff recalls, he learned that a "grass roots voting campaign" was underway to have two of Defendants' employees, Jim Skiba and Robert Fitch, elected to the board as write-in candidates.  Pl. Dep. 71–72.  He was asked:

> Q:  When did you learn that Jim Skiba and Bob Fitch were going to mount a campaign to get on the board?
> A:  I don't know that I ever learned that they mounted a campaign.  They — at some point in February or March 2011, I was told that they were —they were interested in being on the board by then.
> Q: When did you find — okay.  And what did you — who did you find that out from?
> A:  I found that out from an individual in the Coldwater plant that I believe was actually organizing the grass roots voting campaign.
> Q:  And who was that?
> A:  Ryan Craig. . . .
> Q:  Did you know that the write-ins were going to be Skiba and Fitch?
> A:  Yes, I knew that.  Mr. Skiba and Mr. Fitch both contacted me separately and told me that they were aware that there was a write in, there would be a write-in campaign, and that the two of them individually had told me that they were okay with being on that list.

*Id*.

**G**

Shortly before the election, the board of directors held a meeting.  Pl. Dep. 91–92; *see* Defs.' Mot. Ex. 10 (attaching meeting minutes).  The meeting was held on April 29, 2011.  Defs.' Mot. Ex. 10.  All seven directors were present.  *Id*.  By a vote of 4-3, the minutes recount, Plaintiff was voted out as trustee:

> Mr. Smith discussed recent attempts by Brian Sexton and Robert Karsten to seat two employees as Directors of the Company.  They were informed that the By-laws of the Corporation provide that directors are elected at the annual meeting of shareholders, which is upcoming.  Further, the By-laws required at least 3 non-employee directors and their proposed directors would violate this.[5]  They could not elect the Directors by less than all of the Trustees consenting.  They also could

---

[5] Plaintiff identifies nothing in the bylaws to either support or contest whether at least three non-employee directors are required.  An independent review of the copy of the bylaws attached to Plaintiff's response to Defendants' motion reveals no such requirement.

not elect only some and not all of the open Director slots.  Finally, their attempt to hold a premature shareholders meeting lacked proper notice.

Mr. Smith recommended that Robert Karsten and Brian Sexton be removed from the ESOP Administration Committee and terminated as ESOP Trustees.  Mr. Kelly made that motion, seconded by Al Kelsey.  Motion carried 4 to 3 with Bob Karsten, Brian Sexton and Tom Karsten voting against.

*Id.*; *see also* Pl. Dep. 90–91 (discussing board of directors meeting held on April 29, 2011).

## H

A short time later (the parties do not specify precisely when), the election was held.  *See, e.g.*, Pl. Dep. 92 (recalling that the shareholders meeting followed the board of directors meeting).  From the votes submitted by the employees to the trustee on the "trustee direction form," Messrs. LaFleche and Kelsey each received about 150,000 votes.  Messrs. Fitch and Skiba, the employees' write-in candidates, each received more than 200,000 votes.

## I

The board of directors meeting was held on Friday, April 29.  The following Monday, Plaintiff emailed Mr. Smith threatening to report the board's actions to state and federal authorities "unless they are immediately remedied."  Defs.' Mot. Ex. 12.  In full, Plaintiff's email provided:

I believe that your actions on Friday in refusing to seat Bob Fitch and Jim Skiba as directors of the company and removing Rob Karsten and me as Trustees of the ESOP are violations of ERISA and the Michigan Corporations Business Act and other state and federal laws.  I plan to bring these violations to the U.S. Department of Labor and Michigan Department of Licensing and Regulatory affairs unless they are immediately remedied.

*Id.*  Defendants did not respond to Plaintiff's email, much less "remedy" their actions.  Plaintiff, however, did not bring his complaints to the authorities.  Pl. Dep. 99–102.  In his deposition, Plaintiff was asked:

Q:  Did you go to the U.S. Department of Labor?

A: No, I did not.  I spoke with our attorney, Mr. Kanan, at that time.  And actually, I spoke with several other lawyers about it at the time, and they basically said that this type of lawsuit would be something that I would have to file on my own. . . .

Q: Did you go to the Michigan Department of Licensing and Regulatory Affairs?

A: I did not directly, no. . . .

Q: Did you go to the Michigan Department of Labor?

A: No, I did not.  After sending [the email], I met with actually several different attorneys to discuss my options.  Well, I met with attorneys.  Mr. Fitch, Mr. Skiba, met with attorneys.  We had conversations with attorneys and conference calls, basically talking about what can we do to reverse this process.

Q: I'm not going to ask you what they said. . . .

A: You're not going to ask me, but I'm going to tell you what the attorneys told me.  They — the attorneys I spoke with — and I spoke with five different attorneys at different times about what had gone on here.  All five of those attorneys agreed that this was an illegal action and that we did have cause to file a lawsuit.  Unfortunately, I was told that all of those lawsuits have to be funded by the people who file the suits, and they are very expensive. . . .

Q: Okay.  So basically you told — you sent the email to [Mr. Smith] saying, "I'm going to — if these actions are not immediately remedied, I'm going to contact the federal government and the state," and that was the extent of what you — talking to attorneys, talking to Zaborney; that's the extent of what you did?

A: Yeah, I planned to bring these violations to the attention of the U.S. Department of Labor and the Michigan Department of Licensing and Regulatory Affairs.

Q: So you made — you had the threat, you talked to attorneys, you talked to Zaborney, and basically that's what — everything you did?

A: That's correct.

Q: Okay.

A: So far.

*Id*.  As noted, Plaintiff emailed Mr. Smith on May 2, 2011.  About six months passed.

On October 30, 2011, Defendants terminated Plaintiff's employment.  Pl. Dep. 231.  This litigation ensued.

## J

In January 2012, Plaintiff filed a two-count complaint against Defendants in the Alpena County Circuit Court.  Count one asserts a claim under Michigan's Whistleblowers' Protection Act, Mich. Comp. Laws § 15.361 et seq.  Count two asserts a claim for breach of an implied

employment contract under *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (1980).

Defendants removed the case to this Court based on ERISA preemption of the state whistleblower claim. They now move for summary judgment.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III

Count one of the complaint asserts a claim under Michigan's Whistleblowers' Protection Act. It alleges "Defendant[s] violated the Whistleblowers' Protection Act when they discriminated against Plaintiff regarding the terms, benefits, conditions and privileges of his employment because he was about to report a violation or suspected violation of state or federal law." Compl. ¶ 13.

Plaintiff's state whistleblower claim, however, is preempted by ERISA. 29 U.S.C. § 1144. 29 U.S.C. § 1144. And as detailed below, even if construed as an ERISA whistleblower

claim, Defendants are entitled to judgment as a matter of law because Plaintiff neither gave information nor testified "in any inquiry or proceeding."  29 U.S.C. § 1140.

## A

Two specific sections of ERISA are at issue in this case.  The first is § 510 of ERISA, codified at 29 U.S.C. § 1140.  It prohibits retaliating against a person who "has given information or has testified or is about to testify in any inquiry or proceeding relating to [ERISA]."  § 1140.

The second is § 514 of ERISA, codified at 29 U.S.C. § 1144(a).  It preempts all state laws that "relate to" employee benefit plans.[6]  Specifically, § 514 provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." § 1144(a).

The scope of § 514, the Supreme Court observes, "is conspicuous for its breadth." *FMC Corp. v. Holliday,* 498 U.S. 52, 58  (1990); see also  *Egelhoff v. Egelhoff,* 532 U.S. 141, 146 (2001) ("We have observed repeatedly that this broadly worded provision is clearly expansive." (quotation marks omitted)).  "Its deliberately expansive language," the Court emphasizes, "was designed to establish pension plan regulation as exclusively a federal concern."  *Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133, 138 (1990) (quotation marks omitted) (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46 (1987)).  The Sixth Circuit likewise instructs that ERISA preemption spans the entire field — it was enacted "to completely preempt the area of employee benefit plans and to make regulation of benefit plans solely a federal concern."  *Cromwell v. Equicor-Equitable HCA Corp.,* 944 F.2d 1272, 1276 (6th Cir. 1991) (citing *Pilot Life,* 481 U.S. at 44–47).

---

[6] This preemption is subject to some exceptions not relevant to this case.  *See, e.g.,* 29 U.S.C. § 1144(b)(2)(a) (excluding from preemption "any law of any State which regulates insurance, banking, or securities").

Under § 514, "A law 'relates to' an employee benefit plan . . . if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983). "Under this broad common-sense meaning," the Supreme Court explains, "a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll-Rand*, 498 U.S. at 139 (quotation marks omitted) (quoting *Pilot Life*, 481 U.S. at 47).

In *Ingersoll-Rand*, for example, a former employee brought a wrongful discharge suit under Texas law alleging that his employer wrongfully terminated plaintiff because of the employer's desire to avoid paying benefits to the employee's pension fund.  498 U.S. at 140. Before the Supreme Court, the employee argued that ERISA preemption did not apply since "the pension plan is irrelevant to the Texas cause of action because all that is at issue is the employer's improper motive to avoid its pension obligations."  *Id*.  Finding that ERISA preempted the employee's cause of action, the Court wrote that "there simply is *no* cause of action if there is no plan." *Id*.  (emphasis in original).

Similarly, the Sixth Circuit held ERISA preempted a wrongful discharge claim under Michigan law in *Authier v. Ginsberg*, 757 F.2d 796 (6th Cir. 1985).  *Id*. at 798–99.  The employee alleged that the termination of his employment violated Michigan public policy because he was discharged for fulfilling his duties under ERISA.  *Id*.  The Sixth Circuit found that the Michigan state law cause of action was preempted, explaining:

> [E]ven though the Michigan cause of action regulates ostensibly employment relationships and not pension plans, preemption is not precluded in this specific application.  The Supreme Court has noted explicitly that the crucial inquiry is not the purpose of the action; rather, its relation to an ERISA pension plan is determinative.  Thus, we conclude that since ERISA created a substantive element of the Michigan action and since the action turns upon a fiduciary's duties under ERISA, Authier's cause of action is related to ERISA within the meaning of Section 1144(a) and, accordingly, is expressly preempted.

*Id.* at 800 (internal citations omitted) (citing *See Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 524 (1983)).

Likewise, the district court concluded that ERISA preempted a Michigan Whistleblowers' Protection Act claim in *DeFelice v. Heritage Animal Hospital, Inc.*, CIV. 08-14734, 2010 WL 3906147 (E.D. Mich. Sept. 29, 2010) (Hood, J.). The employee alleged that her discharge violated the state whistleblowers' act because she was terminated for reporting a suspected ERISA violation internally and to the local sheriff's department. The court concluded that the state law cause of action was preempted, noting: "Any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Id*. at 5 (quoting *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004)).

In this case, Plaintiff's state whistleblower claim rests on one email that he wrote to Mr. Smith on May 2, 2011. *See* Pl. Dep. 99–102 (quoted above); Defs.' Mot. Ex. 12 (attaching email). In full, the email provides:

> I believe that your actions on Friday in refusing to seat Bob Fitch and Jim Skiba as directors of the company and removing Rob Karsten and me as Trustees of the ESOP are violations of ERISA and the Michigan Corporations Business Act and other state and federal laws. I plan to bring these violations to the U.S. Department of Labor and Michigan Department of Licensing and Regulatory affairs unless they are immediately remedied.

Defs.' Mot. Ex. 12. These allegations "relate to" the ESOP, an ERISA plan.[7] The email itself recognizes as much when it asserts that Defendants' actions "are violations of ERISA." *Id.*

Not only does the email itself expressly acknowledge its connection to an ERISA plan, it depends on it — the accusations have no basis without the Plan. The first allegation is that Mr. Smith erred in not counting votes submitted by employees to the ESOP trustee on the "trustee

---

[7] *See generally Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995) (quoted above).

direction form." This allegation more than relates to the ESOP — there simply is *no* allegation if there is no plan. Similarly, Plaintiff's second assertion, that Mr. Smith erred removing Mr. Karsten and Plaintiff as trustees of the ESOP, requires reference to the ESOP. Plaintiff's Michigan Whistleblowers' Protection Act claim is preempted by ERISA.

Arguing against this conclusion, Plaintiff writes: "Plaintiff's claim in Count I of his complaint under the Michigan Whistleblowers' Protection Act includes Plaintiff's assertion that there were violations of the Michigan Business Corporation Act as well. Even if Plaintiff's claim under the Michigan Whistleblowers' Protection Act is preempted by ERISA, it would not preempt Plaintiff's claim that there were also violations of the Michigan Business Corporation Act and therefore summary judgment as to Count I at this time would be inappropriate." Pl.'s Resp. 7–8. Plaintiff offers no citation to legal authority for his argument. And an independent review reveals none.

Rather, as the above authorities illustrate, a state-law cause of action that "relates to" an ERISA plan is preempted. Plaintiff's claimed violations of the Michigan Business Corporation Act do more than "relate to" an ERISA plan. The violations specifically refer to the ESOP, an ERISA plan. Plaintiff's Michigan Whistleblowers' Protection Act claim is preempted by ERISA.

**B**

Section 510 of ERISA, as noted, prohibits retaliation against an employee "because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this [Act]." 29 U.S.C. § 1140.

In sending the email to Mr. Smith, Plaintiff has undoubtedly "given information."  The issue is whether Plaintiff did so in an "inquiry or proceeding."  That is, does Plaintiff's unsolicited internal complaint qualify for protection under § 510?

Presently, the federal courts of appeal are split on whether § 510 protects such complaints.  *Compare Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 222–24 (3d Cir. 2010) (holding that § 510 does not apply to unsolicited complaints); *Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 330 (2d Cir. 2005) (per curiam) (same); *King v. Marriott Int'l, Inc.*, 337 F.3d 421, 427–28 (4th Cir. 2003) (same); *with George v. Junior Achievement of Cent. Ind., Inc.*, 694 F.3d 812, 815 (7th Cir. Sept. 4, 2012) (Easterbrook, J.) (holding that § 510 applies to unsolicited informal complaints); *Anderson v. Elec. Data Sys. Corp.*, 11 F.3d 1311, 1313, 1315 (5th Cir. 1994) (same); *Hashimoto v. Bank of Haw.*, 999 F.2d 408, 411 (9th Cir. 1993) (same).[8]  The Sixth Circuit has yet to address the issue.

## 1

To begin with the text of the statute, § 510 prohibits retaliating against a person because he gave information "in any inquiry or proceeding relating to [ERISA]."  29 U.S.C. § 1140.

*Webster's* defines "proceedings" as "the course of procedure in a judicial action or in a suit in litigation." *Webster's Third New International Dictionary* 1807 (unabridged ed. 2002).  Similarly, *Black's* defines "proceeding" as "[t]he regular and orderly progression of a lawsuit," "[a]ny procedural means for seeking redress from a tribunal or agency," or "[t]he business conducted by a court or other official body."  *Black's Law Dictionary* 1241 (8th ed. 2004).

---

[8] The circuit split has, predictably enough, received a fair amount of attention in the academic literature. *See, e.g.*,  Adam B. Gartner, Note, *Protecting the ERISA Whistleblower: The Reach of Section 510 of ERISA*, 80 Fordham L. Rev. 235, 255–66 (2011) (discussing circuit split); Malena Kinsman, Comment, *Can You Hear Me? Will the Diminishing Scope of ERISA's Anti-Retaliation Provision Drown the Cries of Whistleblowers?*, 115 Penn St. L. Rev. 685, 688–97 (2011) (same); Adam Reinke, Comment, *Reversing the Perversion: Interpreting ERISA to Protect Employees Who Report Violations of Federal Law to Their Managers*, 61 Emory L.J. 1287, 1294–1309 (2012) (same); Michael C. Ross, Comment, *Blow the Whistle at Your Own Risk: ERISA's Retaliation Provision and the Dilemma of the "Unsolicited Internal Complaint"*, 56 St. Louis U. L.J. 331, 338–46 (2011) (same).

In this case, Plaintiff had not initiated litigation at the time of his email.  No judicial proceeding was pending.  His information was not given in a "proceeding."  Nor was it given in an "inquiry."

*Webster's* defines "inquiry" as "the act or an instance of seeking truth, information, or knowledge about something," or "the act or an instance of asking for information."  *Webster's Third New International Dictionary* 1167 (unabridged ed. 2002).  *Black's* likewise defines "inquiry" as "[a] request for information."  *Black's Law Dictionary* 808 (8th ed. 2004).

The ordinary meaning of an "inquiry" is thus asking for information — not offering it.  By its plain terms, § 510 does not apply to unsolicited information given by an employee.  While the section does not require a dialog,[9] it does not cover an isolated accusation unconnected to any request for information.

Reinforcing this conclusion are the statutory protections provided to whistleblowers elsewhere in the United States Code.  Section 704 of Title VII, for example, protects employees who have "opposed any practice made an unlawful employment practice by [Title VII.]"  42 U.S.C. § 2000e-3(a); *see generally Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (discussing Title VII retaliation claims).

Plaintiff's unsolicited complaint is not protected under the plain language of § 510 of ERISA.

**2**

As noted, the federal courts of appeals have not all reached this conclusion.  On casual inspection, in fact, they appear evenly split on whether § 510 protects unsolicited internal

---

[9] It is possible, for example, that the employee himself could ask for information but receive no response, aside from an adverse employment action.  *Cf. George v. Junior Achievement of Cent. Ind., Inc.*, 694 F.3d 812 , 816–17 (7th Cir. 2012).

complaints.  On closer examination, however, only one circuit — the Ninth — has expressly adopted a rule that would support Plaintiff's claim in this case.

### a

The Ninth Circuit was the first federal appellate court to address whether § 510 protects unsolicited complaints.  *Hashimoto v. Bank of Haw.*, 999 F.2d 408, 411 (9th Cir. 1993).  The case began when a bank employee complained to her supervisors about ERISA violations by the bank.  *Id*. at 409.  When the employee was terminated, she brought a wrongful discharge claim under a state whistleblower statute.  *Id*. at 410.  The district court held that the claim was preempted by ERISA and granted summary judgment to the bank.  *Id*.  The employee appealed.

The Ninth Circuit agreed with the district court that the state whistleblower claim was preempted by ERISA, but "recharacterized" the claim as an ERISA claim brought under § 510. *Id*. at 411–12.  Adopting a purposive interpretation of § 510, the court first observed: "This statute is clearly meant to protect whistle blowers."  *Id*. at 411.  And, although the text of § 510 protects only the giving of information "in any inquiry or proceeding," the court reasoned that "[t]he normal first step in giving information or testifying in any way that might tempt an employer to discharge one would be to present the problem first to the responsible managers of the ERISA plan."  *Id*.  Thus, the court concluded, notwithstanding the express terms of the statute, its protections should extend to informal, unsolicited complaints.  *Id*.  Otherwise, the court cautioned, "the process of giving information or testifying [would be] interrupted at its start: the anticipatory discharge discourages the whistle blower before the whistle is even blown."  *Id*.

**b**

One year later, the Fifth Circuit took up the question.  *Anderson v. Elec. Data Sys. Corp.*, 11 F.3d 1311, 1315 (5th Cir. 1994).  Like the plaintiff in *Hashimoto*, the plaintiff in *Anderson* brought a state law wrongful discharge claim.  Specifically, the plaintiff, an ERISA plan fiduciary, asserted that his employment was terminated for reporting another employee's ERISA violations and refusing to commit ERISA violations himself.  *Id.* at 1312.  The district court concluded that the employee's claim was preempted by ERISA and granted the employer summary judgment.  *Id.* at 1313.  The employee appealed.  *Id.*

The Fifth Circuit affirmed.  In an opinion described by one court of appeals as giving the issue mere "cursory treatment,"[10]  the court concluded that § 510 extends to informal, unsolicited complaints, writing:

> [The plaintiff's] claim falls squarely within the ambit of ERISA § 510.  Section 510 addresses discharges for exercising ERISA rights or for the purpose of interfering with the attainment of ERISA rights, as well as discharges for providing information or testimony relating to ERISA.

*Id.* at 1314 (citation and quotation marks omitted) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)).

The court's decision is explainable based on the dual nature of the plaintiff's claims.[11] But the court's lack of elaboration on how "providing information or testimony relating to ERISA" outside an "inquiry or proceeding" nevertheless "falls squarely within the ambit of ERISA § 510" is less so.

---

[10] *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 223 (3d Cir. 2010); *see* also Reinke, *supra*, at 1295 (critiquing the opinion as "quite superficial and almost entirely without reasoning or explanation").

[11] The employee alleged that he was terminated not only for reporting another employee's ERISA violations, but also for refusing to commit ERISA violations himself.

**c**

Nearly a decade passed without the federal appellate courts addressing whether § 510 protects unsolicited complaints.

In 2003, the Fourth Circuit became the third appellate court to take up the question — and the first to expressly hold that § 510 does not protect unsolicited complaints. *King v. Marriott Int'l Inc.*, 337 F.3d 421, 427 (4th Cir. 2003). The case began when an employee repeatedly complained about the company's vice president transferring millions of dollars from the medical plan to the corporate reserve account. *Id.* at 423. After the employee was discharged, she brought a state law claim and an ERISA anti-retaliation claim. *Id.* The district court granted the employer summary judgment. *Id.*

The Fourth Circuit affirmed. Unlike the Fifth and Ninth Circuits, however, the court concentrated its attention on the text of the statute, beginning:

> The most immediate question is the proper scope of the phrase "inquiry or proceeding." In interpreting a very similar provision of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, we concluded that the term "proceeding" referred only to administrative or legal proceedings, and not to the making of an intra-company complaint. . . . In particular, we explained, "testify" and "institute" both connote a formality that does not attend an employee's oral complaint to his supervisor. . . .

> In the instant case, as well, the use of the phrase "testified or is about to testify" does suggest that the phrase "inquiries or proceedings" referenced in section 510 is limited to the legal or administrative, or at least to something more formal than written or oral complaints made to a supervisor. The phrase "given information" does no more than insure that even the provision of non-testimonial information (such as incriminating documents) in an inquiry or proceeding would be covered.

*Id.* (citations, quotation marks, and internal alterations omitted) (quoting *Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 364 (4th Cir. 2000)). Expressly rejecting the interpretations of the Fifth and Ninth Circuits, the court continued:

> In reaching its contrary decision, the Fifth Circuit merely recited section 510 without even addressing the facial inapplicability of section 510 to intra-office complaints. . . . [T]he Ninth Circuit at least recognized the evident inapplicability of the statute's language to intra-office complaints, but concluded that ERISA provides a remedy since the "statute was clearly meant to protect whistle blowers" and could be "fairly construed to protect a person in plaintiff's position if, in fact, she was fired because she was protesting a violation of law in connection with an ERISA plan." We simply do not agree that the language of section 510 can be "fairly construed" to extend to such a circumstance. Nor do we think that we would be free to reject the most compelling interpretation of the statutory language for a "fair" interpretation, even if we preferred as a matter of policy the result yielded by the broader interpretation.

*King*, 337 F.3d at 428 (citations and brackets omitted) (citing *Anderson*, 11 F.3d at 1315, and

quoting *Hashimoto*, 999 F.2d at 411).

### d

Two years later, the Second Circuit took up the question; it too concluded that § 510 does

not apply to unsolicited complaints by employees. *Nicolaou v. Horizon Media, Inc.*, 402 F.3d

325, 330 (2d Cir. 2005) (per curiam). The case began when an employee discovered that her

employer was underfunding the company's 401(k) plan. *Id.* at 326. The employee brought her

concern to the company's chief financial officer, "who advised her to let the matter drop." *Id.*

The employee then brought the matter to company's controller, "who declined to address it." *Id.*

Unwilling to let the matter drop, the employee next took her concern to an attorney for the

company. *Id.* The attorney "expressed enormous concern" about the matter. *Id.* After

undertaking an internal investigation, the company's attorney told the employee that "he had

confirmed her findings." *Id.* The attorney then suggested that the two bring the matter to the

company's president. *Id.* at 329. When they did, he appeared "not at all pleased that this issue

was being brought to his attention." *Id.* at 326. The employee was demoted "[w]ithin days" of

the meeting with the president, and her employment was terminated about a year later. *Id.* at

326–27.

The employee then brought suit alleging that the employer violated § 510.  *Id.* at 327. Granting the employer's motion to dismiss, the district court explained: "the inquiry contemplated by § 510 can only be a formal, external inquiry."  *Nicolaou v. Horizon Media, Inc.*, No. 01 Civ. 0785(BSJ), 2003 WL 22852680, at *2 (S.D.NY. Oct. 15, 2003), *rev'd* 402 F.3d 325 (2d Cir. 2005).  The employee appealed to the Second Circuit.  Weighing in on the question, the U.S. Secretary of Labor filed an *amicus curiae* brief asserting that a formal inquiry is not required under the statute.  *Nicolaou*, 402 F.3d at 328–29 (discussing Secretary's assertions).

The Second Circuit agreed.  The court began its analysis with the text of the statute — specifically, the ordinary meanings of "inquiry" and "proceeding."  *Id.* at 329.  "We presume that Congress intends that its statutory text be read in accordance with its plain meaning," the court noted, continuing:

> While "proceeding" refers to the progression of a lawsuit or other business before a court, agency, or other official body, "inquiry" refers broadly to any request for information.  The informal gathering of information thus falls within the plain meaning of "inquiry," and we need go no further to conclude that it is protected by Section 510.

*Id.* (quotation marks and citations omitted) (citing *Black's Law Dictionary* 808, 1241 (8th ed. 2004); *Webster's Third New International Dictionary* 1167, 1807 (1993)).   Applying these definitions to the facts of the case, the court found that the employee had alleged sufficient facts to suggest that she had given information in an "inquiry":

> The alleged event that appears to have triggered Nicolaou's termination was the November 1999 meeting at which Nicolaou and Silverman informed Horizon's President, Koenigsberg, of their belief that the company's 401(k) plan had for years been underfunded. . . .
>
> The meeting with Koenigsberg had its genesis in Nicolaou's prior meeting with Silverman, at which she expressed her belief that the Plan was being underfunded.  The amended complaint alleges that after this first meeting, Silverman conducted his own investigation of the Plan and reached the same conclusion as had Nicolaou. . . .

> Certainly, if Nicolaou can demonstrate that she was contacted to meet with Koenigsberg in order to give information about the alleged underfunding of the Plan, her actions would fall within the protection of Section 510. Thus, the district court erred in concluding that, as a matter of law, Nicolaou's allegations could not survive a motion to dismiss because they do not establish the existence of "a formal, external inquiry." The meeting with Koenigsberg was something less than a formal proceeding, but we believe it was sufficient to constitute an "inquiry" within the meaning of Section 510.

*Nicolaou*, 402 F.3d at 329–30 (citation omitted) (quoting *Nicolaou*, 2003 WL 22852680, at *2).

Thus, the Second Circuit thus disagreed with the Fourth Circuit that a "formal" inquiry is required under § 510. The court agreed, however, that § 510 does require an inquiry — that is, that information not merely given, but also asked for. Unsolicited information volunteered by an employee, the court thus implicitly suggested, would be insufficient to state a claim under § 510.

**e**

The Third Circuit was the next federal appellate court to take up the issue — and the third consecutive appellate court to conclude that § 510 does not protect unsolicited complaints by employees. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 223 (3d Cir. 2010), *cert. denied,* 131 S. Ct. 1604 (2011).

The case began when an employee reported suspected ERISA violations to company management. *Id*. at 219. The company responded, the employee alleged, by terminating her employment. *Id*. She brought suit asserting an anti-retaliation claim under § 510 and common law wrongful discharge. *Id*. The employer, asserting that the employee had not engaged in a protected activity under § 510, moved to dismiss. *Id*. The district court granted the motion. *Id*. The employee appealed. *Id*. Again, the Secretary of Labor filed an amicus brief supporting the employee's position. *Id*. "Broadly but naturally construed," the Secretary wrote, "'any inquiry or proceeding' encompasses plan participants' complaints to management or plan officials about

wrongdoing, and the process by which that information is considered, however informal." *Id.* at

222–23 (brackets and internal alterations omitted) (quoting Secretary Br. 16).

The Third Circuit disagreed with the Secretary and affirmed the judgment of the district

court.  Beginning with the text of § 510, the court wrote:

> An "inquiry" is generally defined as "[a] request for information."  Here, Edwards does not allege that anyone approached her requesting information regarding a potential ERISA violation.  Rather, she made her complaint voluntarily, of her own accord.  Under these circumstances, the information that Edwards relayed to management was not part of an inquiry under the term's plain meaning. . . .
>
> Neither is Edwards's conduct encompassed by the term "proceeding."  A "proceeding" is commonly defined as "[t]he regular and orderly progression of a lawsuit" or the "procedural means for seeking redress from a tribunal or agency." Here, there is no suggestion that any such formal action has occurred.

*Edwards*, 610 F.3d at 223 (citations omitted) (quoting *Black's Law Dictionary* 864, 1324 (9th ed.

2009).  Turning to address the other court of appeals decisions on point, the court continued:

> In so holding, we follow the Fourth Circuit's opinion in *King*.  As the *King* court noted, even beyond the plain meaning of "inquiry" and "proceeding," the phrase "testified or is about to testify" implies that the phrase "inquiry or proceeding" is limited to more formal actions.  Not all anti-retaliation statutes are so limited.  In drafting § 1140, Congress could have used broad language similar to that present in the anti-retaliation provision in Section 704(a) of Title VII, which extends broad protection to employees that have "opposed any practice made an unlawful employment practice by [Title VII.]" Congress declined to do so, and, like the court in *King*, we find this choice to be persuasive.  Finally, we agree with the Fourth Circuit that the Ninth and Fifth Circuit opinions in *Hashimoto* and *Anderson,* respectively, are not compelling. Neither court examined the statutory language of Section 510 in detail: the Fifth Circuit gave the issue cursory treatment, and the Ninth Circuit appeared to focus its analysis on the adoption of a "fair" interpretation. . . .
>
> If Section 510 were ambiguous, we would construe the provision in favor of plan participants.  However, as discussed above, we find the provision's plain meaning to be clear.

*Edwards*, 610 F.3d at 223, 224 (citations omitted) (quoting 42 U.S.C. § 2000e-3(a), *King*, 337

F.3d at 427, and citing *Anderson,* 11 F.3d at 1314, *Hashimoto*, 999 F.2d at 411.).

Finally, the court rejected the purposive approach of the Ninth Circuit, explaining: "Although ERISA should be liberally construed in favor of protecting the participants in employee benefit plans, this does not entitle us to ignore clear statutory language." *Id*. (citation and quotation marks omitted) (quoting *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)).

### f

Finally, little more than a month ago, the Seventh Circuit became the most recent federal appellate court to take up the question. *George v. Junior Achievement of Cent. Ind., Inc.*, 694 F.3d 812 (7th Cir. 2012). The case began when an employee "discovered that money withheld from his pay was not being deposited into his retirement account and health savings account." *Id*. at 813. He complained to the company's accountants, executives, and board, as well as the U.S. Department of Labor. The company asked questions of the employee and later issued checks for the money withheld, plus interest. Several months later, the company discharged the employee. The employee brought suit, alleging that he was discharged because of his complaints in violation of § 510. Granting the company's motion for summary judgment, the district court "thought the holdings of *Anderson* and *Hashimoto* to be atextual and followed *Edwards*: § 510's language does not protect employees who make 'unsolicited complaints that are not made in the context of an inquiry or a formal proceeding.' " *Id*. at 814 (quoting *George*, 1:10-CV-0220-JMS-MJD, 2011 WL 4537006, *7 (S.D. Ind. Sept. 28, 2011)).

The Seventh Circuit reversed. Writing for the panel, Judge Frank Easterbrook concluded that "an employee's grievance is within § 510's scope whether or not the employer solicited information." *George*, 694 F.3d at 817. Elaborating, Judge Easterbrook explained:

> The district court was right to rely on the text. This text's interpretation, however, is not straightforward. The provision is a mess of unpunctuated conjunctions and

> prepositions. Although the district court concluded that the language is unambiguous, it is anything but. When dealing with ambiguous anti-retaliation provisions, we are supposed to resolve the ambiguity in favor of protecting employees.

*Id.* at 814 (citations omitted) (citing *Kasten v. Saint–Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1331 (2011)).

Making a subtle but significant observation, Judge Easterbrook noted: "The statute does not specify who asks the question or, more generally, initiates the inquiry. There is no linguistic reason why 'inquiry' cannot refer to the employee's questions as well as the employer's." *George*, 694 F.3d at 815. Accordingly, Judge Easterbrook rejected the employer's argument that "inquiry" "must apply to questions asked *of* the employee but not questions asked *by* an employee," concluding: "Because § 510 refers to inquiries without specifying who is doing the inquiring, it logically covers employees' inquiries." *Id*.

The opinion's observation that an "inquiry" can be initiated by either the employee or the employer is the only reasonable interpretation of § 510 that does not require reading limitations into the statute. That is, as drafted, the section prohibits retaliation against an employee who "has given information . . . in any inquiry or proceeding." 29 U.S.C. § 1140. An interpretation contrary to Judge Easterbrook's would require adding "initiated by an employer" to the text of § 510 — that the section prohibits retaliation against an employee who "has given information . . . in any inquiry or proceeding [initiated by an employer]." This is not the statute that Congress promulgated.

Although the result reached in the *George* opinion is sound, language in the opinion is also susceptible to misinterpretation. That is, in *George* the employee asked questions of his employer; his employer responded by asking questions in return. The employer's questions fit comfortably within the ordinary definition of "inquiry" — "[a] request for information."

-25-

*Webster's Third New International Dictionary* 1167 (unabridged ed. 2002); *see also Black's Law Dictionary* 808 (8th ed. 2004).  The case was correctly decided by the Seventh Circuit.  As noted, however, the opinion goes on to provide that "an employee's grievance is within § 510's scope whether or not the employer solicited information."  Such a categorical assertion is incomplete.  A fuller explanation is that "an employee's grievance is within § 510's scope whether or not the employer solicited information," provided that the employee himself solicited information.  Without the asking for information, there is no "inquiry."

In this case, unlike in *George*, Plaintiff did not ask for any information.  To reiterate, in full Plaintiff's email provided:

> I believe that your actions on Friday in refusing to seat Bob Fitch and Jim Skiba as directors of the company and removing Rob Karsten and me as Trustees of the ESOP are violations of ERISA and the Michigan Corporations Business Act and other state and federal laws.  I plan to bring these violations to the U.S. Department of Labor and Michigan Department of Licensing and Regulatory affairs unless they are immediately remedied.

Defs.' Mot. Ex. 12.  Because this email neither refers to questions asked *of* Plaintiff nor to questions asked *by* Plaintiff, Defendant is entitled to summary judgment on Plaintiff's whistleblower claim.

## B

Having dismissed the only federal claim in this case, the Court declines to exercise supplemental jurisdiction over Plaintiff's sole remaining state law claim of breach of implied contract.  The United States Code provides, "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  Indeed, "a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."  28 U.S.C. § 1367(a); *see Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006) (citation omitted);

*see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.");

*Perry v. Se. Boll Weevil Eradication Found.*, 154 F. App'x 467, 478 (6th Cir. 2005) (noting that dismissal is the "clear rule of this circuit").  As the Court has emphasized, "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *Gibbs*, 383 U.S. at 726.

**IV**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 9) is **GRANTED IN PART**.  Plaintiff's whistleblower claim is dismissed.  Supplemental jurisdiction over Plaintiff's wrongful discharge claim is declined.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 30, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 30, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS